## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-243-001 (CKK)** |
| **v.** | : | |
| | : | |
| **JODI LYNN WILSON,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jodi Lynn Wilson to 28 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Jodi Lynn Wilson, a 45-year-old restaurant server from Swanton, Ohio, participated in the January 6, 2021, attack on the United States Capitol — a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Defendant Wilson pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 28 days' incarceration is appropriate in this case because she (1)

---

[1]      The Statement of Offense in this matter, filed on December 14, 2022, (ECF No. 72 at ¶ 6) reflects a sum of more than $2.7 million dollars for repairs. As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

observed a line of police officers and bicycle racks that separated her son, Cole Andrew Temple, and other rioters from the United States Capitol and saw rioters remove the racks and overrun the police officers; (2) verbally confronted police officers who were holding a line on the other side of the bicycle racks; (3) tried to rally other rioters, shouting for them to join her; (4) with her son, Temple, and others moved a portion of a displaced bicycle rack in order to create a pathway that would allow them access to the East Front of the Capitol; (5) joined other rioters on the steps of the East Front of the Capitol and stood a few feet away from rioters who were physically clashing with U.S. Capitol Police and Metropolitan Police Department officers and forcefully trying to break into the Capitol; (6) joined the crowd of rioters that entered the Capitol at approximately 3:01 p.m. after they had overrun the police officers guarding the Rotunda doors; (7) went to the Rotunda and took photographs and recorded videos in both locations with her cell phone, which she later posted on her Facebook page; (8) remained inside the Capitol for more than fifteen minutes until she and Temple were forced to leave the building by riot gear-clad police officers; and (9) has not expressed sincere remorse for her conduct on January 6. Even if she didn't personally engage in violence or property destruction during the riot, Wilson encouraged other rioters to join her in her effort to move bicycle racks assembled by U.S. Capitol Police officers for the purpose of restricting access to the U.C. Capitol Building.

The Court must also consider that Wilson's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt Congressional proceedings. But for her actions alongside so many others, the riot likely would have failed to disrupt the certification proceedings.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 72 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Temple's conduct and behavior on January 6.

*Defendant Wilson's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Wilson and her son, Temple, traveled together and with friends Gabriel Burress and Madison Pettit, [2] from Swanton, Ohio to Washington, D.C. to attend then President Trump's speech. On January 6, 2021, after missing the speech, Wilson, Temple, Burress and Pettit went to the U.S. Capitol Building to protest Congress' certification of the Electoral College vote.

Upon their arrival on the grounds of the U.S. Capitol Building, Wilson, Temple, Burress and Pettit assembled with others behind bicycle racks and a line of police officers intended to prevent access to the East Front of the Capitol. Wilson wore a pink hooded sweatshirt underneath a dark or black jacket. Temple wore a dark hooded sweatshirt, a royal blue neck gaiter, and a dark blue knit cap with the word "AMERICA" on it. Both are inside the red square in Exhibit 1.

---

[2] Burress and Pettit pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) and were sentenced to 45 days' home detention, 18 months' probation, 60 hours of community service, and $500 restitution. *See United States v. Gabriel Burress and Madison Pettit*, 21-cr-744 (TJK).

3

Exhibit 1



While still behind the bicycle racks, Wilson, accompanied by Temple, verbally confronted police officers near the racks. *See* Exhibit 2.

Exhibit 2



At the same time, Wilson and Temple stood by and watched as other rioters clashed with police officers. *See* Exhibit 3.

Exhibit 3



Wilson and Temple retreated to the middle of the crowd of rioters behind the bicycle racks as others fought to remove the bicycle racks and physically clashed with police officers. Referring to the bicycle racks, Wilson yelled to the crowd surrounding her, "We need everybody. We can't do this by ourselves. Get your asses down here and let's fucking do this. You want to make some fuckin' noise . . . We got to do this together."[3] Minutes later, as Wilson, Temple, Burress and Pettit grabbed a portion of a displaced bicycle rack in order to remove it from obstructing their path to the Capitol, Wilson yelled, "We gotta get this fucking gate out of here."[4] *See* Exhibit 4.

---

[3] Facebook - kevin.bui.754 video_5065387093501774.mp4
https://www.facebook.com/kevin.bui.754/videos/5065387093501774 Timecode: 5:40.
[4] Facebook - kevin.bui.754 video_5065387093501774.mp4
https://www.facebook.com/kevin.bui.754/videos/5065387093501774 Timecode: 7:52.

Exhibit 4



Once other rioters overcame the bicycle racks and police officers, Wilson and Temple quickly moved toward the steps of the Capitol. Exhibit 5 shows Wilson and Temple in the crowd before the bicycle racks and police line were breached and Exhibit 6 shows Wilson and Temple as they quickly moved into the restricted area and toward the steps of the East Front of the Capitol.[5]

---

[5] YouTube - AircraftSparky (UCyTN_QcD7XVHrsbSrHx5hhw) Battle of the Barriers and the Rush towards the Capital Steps https://www.youtube.com/watch?v=185f3LPxUYU&t=1.

Exhibits 5 and 6





Wilson and Temple joined other rioters on the steps on the East Front of the Capitol and stood a few feet away from rioters who were physically clashing with U.S Capitol Police and Metropolitan Police Department officers while officers deployed a smoke bomb or tear gas to halt and deter the rioters from breaking the doors and entering into the Capitol.[6] *See* Exhibit 7.

---

[6] Odysee – vinceableworld Trump Supporters Gather At Capitol House Steps for the Next Push Forward!.mp4 Archive.org Link

Exhibit 7



At approximately 3:01 p.m., after other rioters had overrun police officers guarding the

Rotunda Doors of the Capitol, Wilson entered the Capitol through the broken Rotunda doors,

followed by Temple, Burress and Pettit. *See* Exhibit 8.

---

https://archive.org/download/DitvdKNtPaTAtEGXo/Trump_Supporters_Gather_A.mpeg4
Timecode: 4:25 and 10:50-14:30

Exhibit 8



While inside the Capitol, Wilson and Temple traveled from the Rotunda Doors foyer into the Rotunda and took photographs and recorded videos in both locations with their cell phones.

Surveillance cameras inside the Capitol captured images, including Exhibits 9 - 11, of Wilson and Temple as they left the Rotunda Doors foyer and entered into the Rotunda at approximately 3:02 p.m.

Exhibit 9 - 11







Exhibit 12 shows Wilson and Temple (encircled in red) inside the Capitol and Exhibit 13 shows the presence of riot gear-clad police officers as they corralled and ordered the rioters in the Rotunda, including Wilson and Temple, to leave the Capitol.

Exhibits 12 and 13





At approximately 3:17 p.m., Wilson and Temple exited the Capitol through the Rotunda Doors.

In total, Wilson and Temple spent nearly 17 minutes inside of the Capitol. Both Wilson and Temple have admitted that they knew at the time they entered the U.S. Capitol Building that they did not have permission to do so, and they paraded, demonstrated, or picketed while inside the Capitol.

*Defendant Wilson's FBI Interview*

On August 12, 2021, Wilson was interviewed by Federal Bureau of Investigation ("FBI") agents. She stated that she and Temple traveled with friends, Burress and Pettit, to Washington, D.C. to protest at the U.S. Capitol Building on January 6, 2021. While that statement was truthful, she falsely denied going inside the U.S. Capitol Building. After agents showed Wilson surveillance photographs of her inside the building, she falsely claimed that she asked for permission to enter the Capitol and that police officers "held the door open for [her]," and that an officer had "told me that's what I could do, and I went in, and that's all that I did."

Wilson's statement was contradicted by Temple and video obtained from third parties and the Capitol's surveillance videos. Temple admitted that he saw protesters pushing police barricades and saw officers deploy tear gas against the protesters outside the Capitol before he and Wilson entered the Capitol Building. He admitted that he and Wilson entered the Capitol with a second wave of protesters. He acknowledged that he posted photos or videos of himself to Snapchat while inside the Capitol Building. Finally, he stated that he and Wilson were forced out of the Capitol Building by police officers. Surveillance footage also showed that Wilson and other rioters entered the Capitol with a mob and at no time was there a discussion by Wilson with police officers at or near the Rotunda Doors.

Wilson also falsely stated that police officers lifted the bicycle racks installed on the East Front of the Capitol ten minutes after a Congressman, wearing a nice suit, first lifted a bicycle rack. The government is unaware of any corroboration for that statement.

*The Charges and Plea Agreement*

On August 18, 2021, the United States charged Jodi Lynn Wilson and Cole Andrew Temple by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 1. On August 19, 2021, Wilson and Temple voluntarily surrendered at the FBI office in the Northern District of Ohio. ECF 6, 7. On July 15, 2022, Wilson and Temple were charged in a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF 53.

On December 14, 2022, pursuant to a plea agreement, Wilson pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G). In that plea agreement, Wilson agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Wilson now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. Wilson must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Wilson's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Wilson, the absence of violent or destructive acts is not a mitigating factor. Had Wilson engaged in such conduct, she would have faced additional criminal charges.

The most important factors in Wilson's case are her observation of violent clashes between other rioters with police officers as she stood behind bicycle racks on the East Front of the Capitol, her verbal confrontation with police officers who were manning the bicycle racks to prevent rioters from entering the restricted area of the grounds of the Capitol and approaching the Capitol, and Wilson's efforts to rally other rioters to assist her in removing the bicycle racks. The only reason she entered into the restricted area and gained access to the Capitol was because the bicycle racks and police officers had been overrun by other rioters. While she did not engage in physical combat with police officers to remove the bicycle racks, she and others who she rallied to the cause did

move an already displaced portion of a bicycle rack to clear the path that she and others followed to get to the Capitol Building.

Wilson was also present on the steps of the Capitol and only a short distance from the clash of rioters with police officers attempting to halt or deter the rioters from breaching the Capitol. The scene was loud and chaotic, with sirens blaring.  Nevertheless, Wilson stood her ground on the steps of the Capitol until she, along with Temple, Burress and Pettit were able to join with other rioters and enter the Capitol.

Wilson was a cheerleader for the violence occurring with police officers manning the bicycle racks on the East Front of the Capitol and personally confronted the police officers. She verbally attempted to rally support from other rioters and proclaimed that she could not do this by herself. She shouted, "We need everybody. We can't do this by ourselves. Get your asses down here and let's fucking do this. You want to make some fuckin' noise . . . We got to do this together." Later, she added, "We gotta get this fucking gate out of here."

Once inside the Capitol, Wilson paraded around from the Rotunda Doors foyer, into the Rotunda. Unlike her behavior outside the Capitol, Wilson did not engage in any verbal or physical encounters with police officers or cause damage to the Capitol. However, she did take photos and videos, which she later posted on her Facebook page. By posting the images to Facebook, Wilson clearly sponsored the content and celebrated the activities of January 6, 2021 at the Capitol.

The first plea hearing in this matter scheduled for October 24, 2022, was continued, in part, because of statements the defendant made that were inconsistent with the Statement of Offense. The defendant attempted to minimize her criminal conduct. Later, at the plea hearing held on December 14, 2022, Wilson admitted that she knew she did not have permission to enter the Capitol on January 6, 2021, that she paraded, demonstrated, or picketed inside the Capitol on that date, and that she violated 40 U.S.C. § 5104(e)(2)(G).

Accordingly, the nature and circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Wilson's History and Characteristics

As set forth in the Presentence Investigation Report ("PSR"), Wilson has no criminal history. PSR ¶¶ 25-30. She has primarily worked as a waitress for almost 30 years. Since 2020, she has been employed as a server. She also works as a bartender. PSR  ¶¶ 48-51.

She is a high school graduate and has earned approximately 120 hours of college credit. Additionally, she has obtained a commercial driver's license and a real estate license. PSR ¶¶ 45-47.

As the Court is aware, this defendant has medical ailments, the result of which she has been prescribed the following medications: Klonopin, Tramadol, Flexural, Ibuprofen 800 mg., Valtrex, and a muscle relaxer. PSR ¶ 39. She reported that she is also severely anemic, takes hemoglobin and iron supplements, and was hospitalized in January 2023 for this condition. PSR ¶ 38.[7]

She has been compliant with her conditions of pre-trial release.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the

---

[7]     Wilson's plea hearing in this matter was originally scheduled to take place on October 24, 2022, but was continued to November 16, 2022. Due to the defendant's hospitalization on that date, the plea hearing was continued to December 14, 2022.

presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

While Wilson has admitted that she engaged in criminal conduct on January 6, her failure to appreciate the wrongfulness of her conduct on that date as she confronted police officers on the East Front of the Capitol and when she entered the Capitol Building – even after witnessing violent clashes by other rioters with police officers – suggests the need for some specific deterrence in this case.

Furthermore, Wilson's words on January 6 also demonstrate the need for specific deterrence. She boldly verbally confronted police officers who were engaged in their duties to protect the U.S. Capitol Building and the grounds from the rioters. Wilson also rallied those around

her to gain their support in moving the bicycle racks that obstructed hers and their access to the U.S. Capitol Building. Her words and actions call for a measure of specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Wilson based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Wilson has pleaded guilty to Count Four of the Information, charging her with parading, demonstrating, or picketing inside the Capitol, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider ... the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several

factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the

spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, in which the defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G) and faced sentencing for that offense, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

1. In *United States v. Sarko,* 21-cr-591 (CKK), the defendant, like Wilson, pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G). Sarko observed rioters making violent entry into the U.S. Capitol Building and proudly exclaimed, "We are storming the Capitol out here;" "Where are the traitors;" "Bring out Pelosi;" "We won't let you steal this country;" "We're actually breaking in right now;" and, "Fight for Trump." Like Wilson, Sarko attempted to rally other rioters that surrounded him. However, Sarko also entered into Senator Markley's office and other offices without authorization and had adult criminal convictions. This Court sentenced Sarko to 30 days' imprisonment and 36 months' probation.

2. In *United States v. Janet West Buhler,* 21-cr-510 (CKK), the defendant entered and remained in a sensitive area of the Capitol, cheered as rioters physically assaulted U.S. Capitol

Police officers at the East Rotunda doors. Like Wilson, Buhler ignored several red flags upon approaching and entering the Capitol Building, including the bicycle racks intended to deny access to the Capitol, Buhler similarly ignored sounds of flashbangs being detonated, plumes of smoke clouding the air, rioters tearing down a tarp covering the northwest staircase of the Capitol Building, and shattered glass that was the result of rioters breaching the Senate Wing Doors. This Court sentenced Buhler to 30 days' incarceration followed by 36 months' probation.

These cases demonstrate the need to impose periods of incarceration where a defendant has ignored obvious red flags that their presence inside the Capitol on January 6 was criminal.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. [9]

---

[9] Numerous judges of this Court, including Your Honor,  have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States,

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 28 days' incarceration. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing her

---

*United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    <u>s/ Anita Eve</u>
Assistant United States Attorney
PA Bar No. 45519

## **CERTIFICATE OF SERVICE**

On this <mark>XX</mark> day of March 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

 /s/ Anita Eve
Assistant United States Attorney
PA Bar. No. 45519